# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 19-579V

Filed: May 20, 2025

```
* * * * * * * * * * * * * * * * *
GINGER K. WILLIFORD,              *
                                  *
              Petitioner,         *
                                  *
v.                                *
                                  *
SECRETARY OF HEALTH               *
AND HUMAN SERVICES,               *
                                  *
              Respondent.         *
                                  *
* * * * * * * * * * * * * * * * *
```

*William Cochran, Jr., Esq.*, Black McLaren, et al., PC, Memphis, TN, for petitioner.
*Neil Bhargava, Esq.*, U. S. Department of Justice, Washington, DC, for respondent.

## FACT RULING[1]

On April 17, 2019, Ginger K. Williford ("petitioner") filed a petition pursuant to the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 *et seq.*[2] ("Vaccine Act" or "the Program"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of the influenza ("flu") vaccination she received on December 28, 2017. In the alternative, petitioner alleges she suffered a shoulder injury that was caused in fact by the vaccine. Petition at 1, ECF No. 1.

During the pendency of this matter, petitioner filed several of affidavits, as well as affidavits from multiple witnesses. Petitioner and most of her witnesses testified at hearing. The affidavits, fact hearing testimony, other evidence filed, and contemporaneous medical records present many inconsistencies regarding the events that occurred and petitioner's delay in seeking treatment for five and a half months. However, this ruling only addresses onset. When special

---

[1] This Ruling has been designated "to be published," which means I am directing it to be posted on the Court of Federal Claims's website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). **This means the Ruling will be available to anyone with access to the internet.** However, the parties may object to the Ruling's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Ruling will be available to the public. *Id.*

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

masters are confronted with discrepancies, they are encouraged to hold a hearing to evaluate the testimony of the affiants. *See Campbell v. Sec'y of Health & Human Servs.,* 69 Fed. Cl. 775, 779-780 (2006). Thus, a fact hearing was held on June 8, 2022.

Having carefully considered the affidavits, testimony, and all other evidence presented as it relates to onset only, petitioner developed aching and soreness immediately upon receipt of her flu vaccination.

## I.      Procedural History

The petition was filed on April 17, 2019 and assigned to the Special Processing Unit ("SPU"). ECF Nos. 1, 4. Medical records were filed along with petitioner's affidavit and a statement of completion. Petitioner's Exhibits ("Pet. Ex.") 1-14, ECF Nos. 7-9.

During a status conference on June 21, 2019, additional outstanding medical records were identified and ordered. ECF No. 10 at 1. The origin of petitioner's pain and injury was discussed, and reasonable basis was raised. Respondent was ordered to file a status report advising of his tentative position once the medical records were filed. *Id*. at 2.

Thereafter, petitioner's counsel emailed the Chief Special Master's chambers expressing his reticence in filing additional records due to reasonable basis being raised. He requested a preliminary ruling from the Chief Special Master on reasonable basis. An Order was issued on July 15, 2019 denying that request, but petitioner was permitted to wait for respondent's formal review of the case before filing additional records. ECF No. 11.

Respondent filed a status report on June 15, 2020 advising that he intended to defend the case, and filed his Rule 4(c) Report on August 14, 2020, recommending against compensation. ECF Nos. 19-20. The case was then transferred from SPU and reassigned to the undersigned. ECF Nos. 21-22.

Thereafter, petitioner filed additional medical records and the affidavits of Vikki Morgan and Ben Mills. Pet. Ex. 15-21, ECF No. 22; Pet. Ex. 22-23, ECF No. 25. She also filed two articles related to shoulder injuries and vaccines. Pet. Ex. 24-25, ECF No. 26.

At a status conference on November 10, 2020, the issues related to petitioner's medical records were again discussed in detail. This included, but was not limited, to the significant delay before petitioner sought medical care, an apparent escalation of her symptoms after May 2018, and a motor vehicle accident in which petitioner sustained injuries to her neck and shoulders. ECF No. 28. Petitioner filed a status report on December 23, 2020, advising that she intended to proceed by filing additional fact witness affidavits to address the concerns raised during the status conference. ECF No. 29.

Petitioner then filed affidavits from David Mills, Cindy Griffith, and Carlton Andrew Williford, as well as supplemental affidavits from herself, Vikki Morgan, and Ben Mills. Pet. Ex. 26-31, ECF Nos. 31, 34.

Respondent filed a status report on April 21, 2021, maintaining his intent to defend the case. ECF No. 36. Petitioner then requested to file a motion for a fact finding, but respondent recommended a fact hearing if petitioner wished to continue to pursue the case noting that reasonable basis had already been raised. ECF Nos. 37, 39.

A status conference was held on June 29, 2021 to discuss additional issues that were raised by the affidavits filed and to determine how to proceed. Petitioner was ordered to file all Google searches related to shoulder injuries and/or SIRVA and a status report advising if she intended to proceed with a motion for ruling on the record or a fact hearing. ECF No. 43.

On September 7, 2021, petitioner filed a letter and CV from her treating orthopedist, Dr. Randal Troop. Pet. Ex. 33-34, ECF No. 48. Petitioner filed what purported to be her Google search histories on November 11, 2021. Pet. Ex. 35-39, ECF No. 52.

A fact hearing was held on June 8, 2022. Following the hearing, respondent filed petitioner's Facebook photos that were presented during the hearing. Respondent's Exhibit ("Resp. Ex.") A, ECF No. 56. Petitioner was ordered to file additional evidence, and she filed Facebook photos as well as an affidavit. Pet. Ex. 40-46, ECF Nos. 60-61.

After both parties agreed, the record was closed for purposes of a fact ruling on September 28, 2022. ECF Nos. 63-65.

This matter is now ripe for a fact ruling.

## II.    The Factual Record

### A.  Petitioner's Medical Records

Petitioner had no prior left shoulder injury or complaints. Her past medical history included trouble sleeping, leg and ankle swelling, and arthralgias of her knees, ankles, and hand with joint pain in the right thumb. *See generally* Pet. Ex. 2.

Petitioner presented for a routine physical on December 28, 2017. Pet. Ex. 2 at 2-11. She reported generalized arthralgias of the knees, ankles, and hands, and some joint swelling, but no morning stiffness. *Id*. at 6. She reported chronic trouble sleeping and hoped retirement would help. An examination was unremarkable but for minor left leg and ankle swelling. She had a family history of rheumatoid arthritis, but testing was negative. *Id*. at 9-10. She received the subject flu vaccine in her left arm. *Id*. at 2, 10.

Due to a family history of breast cancer, petitioner presented for routine monitoring at Texas Breast Specialists in February 2018. She had no complaints at that visit. Pet. Ex. 9; Pet. Ex. 11 at 2-4.

On March 30, 2018, petitioner presented to Trey Tanella at Top Spa LLC. Pet. Ex. 13; Pet. Ex. 17. Petitioner completed a questionnaire prior to her visit documenting her main health concerns as "lymph system; left ankle swells; ocular rosacea, demodex mites eyelash line breast

3

cancer runs in family, but am going in twice annually for screenings." Pet. Ex. 17 at 1. She listed her other concerns and/or goals as "[n]eed to have a daily exercise plan: yoga, strength training, walking." *Id*. Under serious illnesses/hospitalizations/injuries, she included "upper and lower jaw surgery for orthodontics; have had two basal cell carcinomas and 2 squamous cell skin cancers removed." *Id*. Regarding pain, stiffness, or swelling, she responded "yes, depends on weather; left ankle swells." She also noted that sugar and gluten caused gastrointestinal issues, she had very sensitive skin and seasonal allergies. She listed the supplements she was taking. *Id*. at 2. For sports and exercise, she reported that she was "beginning to play golf more, walk more often, use Bowflex; plan on starting yoga." *Id*. She took Xanax for trouble sleeping. She rated her stress level as a 5-6 out of 10 and identified her major stressors as "retired – getting used to it/possibly moving." *Id*. at 4. There was no mention of left shoulder or arm pain.

The record from the date of the appointment included the same health concerns noted on the questionnaire as "Primary Symptoms." Pet. Ex. 13 at 1. The "Summary" section documented sleep issues, supplement dosages, energy levels, "possible adrenal dysfunction", lymphatic drainage, and a low inflammation diet. *Id*. at 2. The record included results of "Comprehensive Metabolic Panel" and "Complete Blood Count with Differential with handwritten notes of possible biliary obstruction, kidney filtration issues, muscle wasting, respiratory distress, anemia, thyroid hyperfunction, liver cirrhosis, and celiac. *Id*. at 3-5. There was no mention of left shoulder or arm pain.

On May 16, 2018, petitioner presented to Dr. Troop, an orthopedist. The record documents:

The symptoms have been present for 4.5 months. She reports that the soreness in the shoulder began after she had a flu shot in her left deltoid. She reports that the soreness never resolved and has gradually worsened over time. Pain is severe with a rating of 10/10. The symptoms often cause the patient to wake from sleep. She describes the symptoms as aching and burning. The symptoms are constant. Since the onset, she reports the problem is getting worse. The symptoms are made worse with bending, twisting, lying in bed, gripping, lifting and reaching overhead. The patient experiences tingling and weakness.

Pet. Ex. 3 at 9. On examination, Dr. Troop noted a positive impingement sign, tenderness with no instability, and 5/5 strength. X-rays showed narrowing of the AC joint. The assessment was "impingement syndrome of left shoulder."[3] Petitioner was prescribed A Medrol Dosepak and Mobic. An MRI was ordered. *Id*. at 10. On a form petitioner filled out the day prior to her visit, she checked off "injury" with an injury date of December 28, 2017, and "nurse gave me a flu shot." *Id*. at 21-22.

Petitioner returned to Dr. Troop on May 21, 2018 to discuss her MRI results. Her symptoms had improved, and her pain was a 7/10. Pet. Ex. 3 at 6. Dr. Troop agreed with and summarized the MRI findings as "Mild RC tendinopathy with no evidence of full thickness rotator cuff tear. Type 2 Acromion. Mild degenerative changes of the acromioclavicular joint." *Id*. at 7, 15. His

---

[3] Impingement syndrome is "a type of overuse injury with progressive pathologic changes resulting from mechanical impingement by the acromion, coacromial ligament, coracoid process, or acromioclavicular joint against the rotator cuff; changes may include reversible edema and hemorrhage, fibrosis, tendinitis, pain, bone spur formation, and tendon rupture." *Impingement syndrome*, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1804 (33rd ed. 2019).

assessment remained impingement syndrome of the left shoulder. Physical therapy ("PT") was recommended, and she was to continue taking the medication prescribed previously. She received an injection of Marcaine and Depo-Medrol. *Id*. at 7.

Petitioner presented for an initial PT evaluation on May 31, 2018. She reported intermittent left hand pain and tingling and posterior left shoulder pain. Pet. Ex. 5 at 1-3; Pet. Ex. 8 at 3-5; Pet. Ex. 3 at 14. She reported loss of motion when trying to do yoga. The pain was worse when sleeping on her left side causing disturbed sleep. She reported being unable to reach overhead or behind her back. Her symptoms were better when taking anti-inflammatory medication and with yoga stretches, walking, and moving. Pet. Ex. 5 at 1. She had a cortisone injection 10 days ago and felt 30% better. An MRI showed an inflamed rotator cuff, and she was prescribed a Medrol Dosepak. She was retired and enjoyed golf. *Id*. The assessment on examination was left shoulder impingement and "possible cervical radiculopathy." It was further noted that she may be developing adhesive capsulitis as she exhibits a capsular pattern of left shoulder range of motion loss, but her right shoulder is hypermobile. *Id*. at 2. Her cervical range of motion was within normal limits, except for a mild deficiency with active left rotation, and passive left rotation was within normal limits, but passive cervical flexion reproduced tingling in her pinkie finger. There were deficits with left functional reaches, shoulder strength was 4-/5 with pain, and scapular stabilizer strength was 3-/5 with pain. Testing was positive for impingement and external rotation lag. Upper limb tension tests were negative. *Id*. Petitioner reported difficulty with cooking, lifting, sleeping, and bathing/grooming/dressing her upper body. *Id*. Four weeks of physical therapy was recommended. *Id.* at 4.

On June 5, 2018, petitioner established care with a new cardiologist. Pet. Ex. 20 at 8-9. She was noted to have bilateral ankle edema more on the left but no joint tenderness, swelling, or erythema. *Id*. She reported seeing Dr. Troop and a physical therapist for rotator cuff impingement after a flu shot. *Id*. at 12. Her exercise included walking and golf. *Id*. at 14. Testing was ordered and she had a duplex ultrasound of the carotid artery on June 7, 2018, and labs done on June 12, 2018. Pet. Ex. 20 at 24-26, 28-34.

On a form for Plano Orthopedic Group, petitioner marked pain, numbness/tingling, and stiffness in her left shoulder, upper arm, elbow, forearm, wrist, hand, and all fingers, and neck pain that radiates from "left shoulder down arm to little finger." The problem was the result of an injury, was a "chronic condition" and the symptoms had been present since December 28, 2017. *Id*. She rated her pain as a 10, it woke her from sleep, and was "sharp," "constant" and "getting worse" with "some change w/ physical therapy." *Id*. at 12. The symptoms were worse with twisting, lifting, and reaching overhead. *Id*. She noted improvement with physical therapy, and that "Dr. Troop recommend 4 physical therapy sessions in the beginning, but now has recommend more cause of suppected (sic) nerve damage." *Id*.

Petitioner attended eight PT sessions between May 31, 2018 and her discharge date of July 9, 2018. Pet. Ex. 10; Pet. Ex. 12. The record noted the following during the course of her PT treatment: decreased tingling in her hand; more left sided neck pain upon waking; muscle soreness due to packing boxes for moving but no increase in symptoms; increased numbness in the ulnar aspect of the left arm; a referral to Dr. Dauber for a nerve assessment, noncompliance with home exercise, and mild shoulder pain that comes and goes but constant paresthesia in the pinkie and

5

forearm; displeasure with Dr. Dauber's assessment that her neck and shoulder are unrelated but agreeable to continue the PT plan to address her neck and shoulder; improved symptoms after dry needling but aggravated symptoms after lifting her grandchild, constant pinky numbness and intermittent left arm tingling with symptoms worsening when sleeping on her left side, and inability to reach overhead. Pet. Ex. 5 at 5, 7, 9, 11, 13, 15, 17.

When petitioner returned to Dr. Troop on June 18, 2018, her symptoms were improved since her last visit with moderate pain at 6/10. The symptoms and location were the same. Pet. Ex. 3 at 4. On examination, she had full range of motion, some limitation on internal rotation, mild impingement, some tenderness, no instability, and 5/5 strength. The assessment was impingement syndrome of the left shoulder and "radiculopathy, cervical region." She was to continue PT. *Id*. at 5.

On June 20, 2018, petitioner presented to Dr. Dauber on referral from Dr. Troop with a chief complaint of "[p]ain Numbness/Tingling Stiffness left shoulder, neck, left upper arm, left elbow, left wrist, left hand, left thumb, left index finger, left middle finger and left small finger" present since December 28, 2017.  Pet. Ex. 3 at 1. She rated her pain as severe, a 10/10 that often woke her from sleep. She described the symptoms as sharp, constant, and worsening since the onset. *Id*. Petitioner reported that she received a flu vaccine which "may have started the aggravation in her left upper extremity." *Id*. She had been going to physical therapy for a rotator cuff issue. On examination, strength and sensation were grossly intact in both extremities. She had mild limitations in rotation of the cervical spine to the left. She had "a trigger point in her left trapezius and marked tightness," but she had "[f]ull range of motion left shoulder in all planes." Pet. Ex. 3 at 2. X-rays of the cervical spine showed no abnormalities. Dr. Dauber diagnosed petitioner with myalgias and paresthesia of skin and thought that her symptoms were being caused by a trigger point. He recommended physical therapy for the cervical spine. *Id*.

A PT re-evaluation summary from July 9, 2018 included eight sessions of PT for left shoulder impingement and cervical radiculopathy. Dry needling of the left upper extremity at the previous visit resolved her symptoms, but she had increased symptoms at this visit after lifting a grandchild. Pet. Ex. 5 at 24. Petitioner demonstrated improved range of motion and strength, and testing of the left shoulder were negative. The remaining symptoms "seem to be cervicogenic", and she was advised to follow up with a neurologist prior to continuing PT. *Id*. at 24-25.

Petitioner presented to the Cardiac Center of Texas on July 9, 2018 for high resolution computed tomographic imaging of the chest. Pet. Ex. 20 at 19.  On July 12, 2018 she presented for a transthoracic echocardiogram. *Id*. at 15.

Petitioner returned to the cardiologist on July 23, 2018 to review her test results. The reviewed problems listed included synovial cyst of the knee, edema of the lower extremity, and hyperlipidemia. Pet. Ex. 20 at 5-6. She had bilateral mild edema of the legs, left more than right, that was concerning for May-Thurner Syndrome. She was prescribed medication for the edema but refused a statin for hyperlipidemia. *Id*. at 7

Petitioner presented to Dr. Benae, a neurosurgeon, on July 24, 2018 for neck and left upper extremity pain/paresthesia. Pet. Ex. 6 at 7.  Dr. Benae wrote, "[r]eports months after flu vaccination

she noted pain in her neck and [left upper extremity] as well as numbness radiating to [left] small finger. Became unable to do typical duties such as carrying luggage. Feels this pain was a significant contributor to her retirement most recently." *Id*. She reported having PT recently and chiropractic treatment in the past, but none recently. She received a cortisone injection for left rotator cuff inflammation that was seen on MRI. She had not tried gabapentin. *Id*. An x-ray of the cervical spine revealed multilevel spondylosis, worse at C6-7 with increased motion at C5-6 and C6-7. *Id*. An examination revealed arm pain, arm weakness, and numbness. *Id*. at 8. Inspection and palpation of the cervical spine was within normal limits with no erythema, swelling, deformity or tenderness. Spinal curves were normal with no scoliosis. Her range of motion was within normal limits and muscular strength was 5/5. *Id*. at 9. There was some swelling of the bilateral lower extremities. The assessment was cervicalgia, spondylosis, and unspecified pain in her arm. *Id*. An MRI of the cervical spine was ordered. *Id*. at 10. On a pain diagram, petitioner marked her areas of pain from the top of her neck through and including her hand, with the hand pain noted as "stabbing." She rated 8 out of 10 pain "since 12/28/2017." *Id*. at 50.

Petitioner returned to Dr. Benae on July 30, 2018. Pet. Ex. 6 at 4. The MRI showed multilevel spondylosis with the presence of a disc/osteophyte protrusion on the left at C6/7. *Id*. at 4, 23. She reported arm pain, weakness, and numbness. *Id*. at 5. Examination of the cervical spine was within normal limits. Dr. Benae's assessment was cervicalgia, cervical region spondylosis without myelopathy or radiculopathy, and unspecified pain in arm. An increase of gabapentin and PT were discussed. Pet. Ex. 6 at 6.

Petitioner's next medical visit was to UT Health Austin in December 2018 to establish general care after having moved to Austin, Tx in July, 2018. Pet. Ex. 18 at 38.

Petitioner also established care with a new cardiologist on December 20, 2018. She reported her prior cardiac history and testing. Pet. Ex. 14 at 4. She reported severe chest pain a few weeks ago with some mild numbness in her left arm that lasted for several hours. She had the same symptoms the next day and the day after. "… she has continued to have left arm numbness that radiates into the fifth digit. She is still having trouble falling asleep on her left side due to numbness and pain." *Id*. She had "prior problems with her rotator cuff that she reports was caused by the flu shot." *Id*. She believed her symptoms were related to starting Prempro which she stopped taking without recurrent symptoms. She has a history of lower leg swelling treated with Lasix. *Id*. Examination was normal, with normal musculoskeletal range of motion, no edema, tenderness, or deformity. *Id*. at 5.

On February 15, 2019, petitioner returned to Dr. Troop reporting 6 out of 10 pain, some radiating numbness and tingling into her arm and hand. Pet. Ex. 7 at 1-2. Dr. Troop's assessment remained impingement syndrome of the left shoulder and cervical radiculopathy. A Medrol Dosepak was prescribed, and a steroid injection was administered. *Id*. at 2.

Petitioner presented to Dr. Wang at Austin Heart Southwest on March 12, 2019 for a sleep disturbance evaluation. Her son was diagnosed with sleep apnea, and she was now concerned about her own sleep. Pet. Ex. 14 at 1.

She returned to UT Austin for referrals for general health in April 2019. Pet. Ex. 18 at 20-22.

At a physical at UT Health Austin on July 29, 2019, petitioner refused a flu vaccine, reporting a "painful reaction to flu vaccine in 2016."[4] Pet. Ex. 19 at 5-6. She reported that she walked five days a week but was inconsistent with weight training due to a left shoulder injury with arthralgias and joint pain from a vaccine. *Id*. at 7. Examination revealed normal movement of all extremities with tenderness of the left shoulder on overhead reach and abduction. *Id*. at 8. She reported that her orthopedist in Plano said her shoulder pain was a vaccine injury. She was going through a settlement for her injury. She needed to call her lawyer to see if she could be evaluated and treated by another provider locally. *Id*. at 10.

Petitioner was involved in a motor vehicle accident on September 20, 2019 and presented for medical care on October 1, 2019. She reported some chest tightness and an occipital headache at the time of the accident. She later developed right and left ear pain. She was noted to have bruising on her legs, hips, and ribs, and had a lot of neck and shoulder pain. Pet. Ex. 19 at 13.

Petitioner presented for PT for her injuries. Pet. Ex. 19 at 21. She complained of pain and tingling in her neck, left upper scapula, shoulder, posterior arm, and forearm into the fourth and fifth digits, with the worst pain in her posterior arm. She reported that her ongoing left shoulder pain was due to a flu shot she received in December 2017 but an MRI had not shown any significant issues. *Id*. She had received two cortisone shots and had PT with some improvement, but her symptoms had flared following the motor vehicle accident. She was unable to carry her grandchild but could carry groceries. She was doing yoga with modifications prior to the motor vehicle accident. She had not played golf since 2018 and wanted to return to playing. *Id*. She continued to present for PT thereafter for pain in her neck, left shoulder/upper extremity, and ribs. *Id*. at 29-37.

Petitioner's updated medical records reflect additional cardiac care and concern for May-Thurner syndrome due to lower leg edema. Pet. Ex. 20.

On January 29, 2020, petitioner presented to Dr. Ring, an orthopedist. Pet. Ex. 21 at 7. She provided a history of flu vaccine in 2018[5] with typical shoulder pain that did not go away. After three weeks, she became concerned and "Googled it." The first thing she found was that this might be a compensable injury, having not had pain like this before, it resonated with her. *Id*. She went to Dr. Troop, who diagnosed her with bursitis and agreed that her shoulder was injured by the vaccination. She was examined by a neurologist for her neck. She loves golf and yoga but gave these up due to feeling injured, and her goal was to return to these activities. *Id*. She did not report the motor vehicle accident in which sustained injuries to her neck, left shoulder, and arm at this appointment. An examination of the left arm revealed no swelling, ecchymosis, erythema, or deformity, with stable joints, normal strength and function, and full range of motion of shoulder, elbow, forearm, wrist, and hand. *Id*. Dr. Ring wrote, "I told her that—had she never had a vaccination into her shoulder in her life – I would diagnose rotator cuff tendinopathy with extreme confidence and affirm current treatment." Pet. Ex. 21 at 8. She was encouraged to play golf and do yoga because moving is beneficial. Dr. Ring noted "no signs of a large defect on exam . . . Fluid

---

[4] Petitioner's flu vaccine was on December 28, 2017. Petition at 1.
[5] Petitioner's flu vaccine was on December 28, 2017. Petition at 1.

around the tendon (bursitis) is part of this illness and it sounds like there was not a large defect and nothing else of concern." *Id*. Further, he wrote:

> Rotator cuff tendinopathy is like greying and thinning of the hair—it comes with the years. Neither symptoms, nor progression are related to activity. Variations are likely genetic. Defects (bald spots to continue to aging scalp analogy) are often described as "tears", but they are part of the disease, and uncommonly related to injury. Sizable defects with good muscle are considered for surgery. The largest, long-standing defects may not be repairable if the muscle is no longer healthy. We don't know for sure whether or not smaller defects benefit from surgery. The mainstays of treatment are adaptation and adherence to one's normal routine, nonspecific pain relief strategies, and exercises to strengthen the rotator cuff muscles. A recent meta-analysis of corticosteroid injection found minimal, short-lived pain relief. Steroid injection should be used sparingly as it accelerates tendon degeneration.

Pet. Ex. 21 at 8. Dr. Ring coded the visit as unspecified rotator cuff tear or rupture of left shoulder, not specified as traumatic. *Id*.

No further records of left shoulder treatment were filed.

Petitioner filed a letter from Dr. Troop dated August 12, 2021. Pet. Ex. 33. It appears that Dr. Troop responded to questions raised by petitioner's counsel, which were also included in the exhibit. Dr. Troop wrote that he first saw petitioner on May 16, 2018, at which time she reported developing pain in her left shoulder after receiving a flu vaccine on December 28, 2017. *Id*. Following a complete history and physical examination, he diagnosed her with subacromial impingement of the left shoulder. He wrote that he has seen vaccinations be the mechanism for subacromial impingement, which can happen when the injection is placed into the subacromial space instead of intramuscularly into the deltoid. *Id*. According to Dr. Troop, it is reasonable to conclude that petitioner's flu vaccine was a substantial cause of her condition, because the injection can cause irritation and swelling of the subacromial bursa and rotator cuff tendinosis if it is pushed into the subacromial space. *Id*. Further, "[t]he onset of Ms. Williford's symptoms occurred within a time frame consistent with a causative relationship with the flu vaccination." *Id*. Dr. Troop added that Ms. Williford's cervical radiculopathy was diagnosed by Dr. Dauber as a trigger point irritation in the region of the trapezius, and "[w]hile this could result in additional left shoulder pain, there is no causative relationship between the myalgias and the impingement symptoms." *Id*.

### B.  Affidavits and Testimony

Petitioner and her witnesses provided detailed affidavits and testimony regarding a host of issues that exist in this case. However, only onset is being addressed in this ruling, and only the affirmations and testimony relevant to that issue of onset will be highlighted herein.

### 1.  Petitioner, Ginger Williford

Petitioner submitted two affidavits and testified at the hearing. Pet. Ex. 1; Pet. Ex. 31.

Petitioner confirmed receipt of a flu vaccine in her left arm at her primary care physician's office on December 28, 2017. Pet. Ex. 1 at 1. She received a flu shot every year and suffered the usual mild flu-like symptoms. She had no history of shoulder pain, injury, or loss of range of motion in her left arm or shoulder prior to her receipt of the flu vaccine. Tr. 131-32; Pet. Ex. 1 at 1.

According to petitioner, she felt pain "immediately" but "[i]t wasn't like anything other than it hurt." Tr. 135-36; 206-07; Pet. Ex. 1 at 1; Pet. Ex. 31 at 1. Between December 28, 2017 and March 2018, her shoulder continued to hurt. The pain did not go away and got "gradually worse." Tr. 139; Pet. Ex. 1 at 1; Pet. Ex. 31 at 1. Initially, only her left arm and shoulder hurt, then "at some time weeks or months later" though she could not recall when, she developed pain in her neck and numbness radiating to the left small finger. Pet. Ex. 31 at 2. She tried to treat the pain with heat, ice, and over the counter remedies, walked daily, worked on her sleep, and thought it may get better without the stress of working once she retired, but the pain did not resolve. *Id.*; Tr. 142. She discussed her arm pain from the flu vaccine at work and raised it at a team meeting. Tr. 139-40.

Petitioner confirmed that in the time between her receipt of the flu vaccine and when she first presented for medical care on May 16, 2018, she and her husband took turns driving the 220 miles each way from their home in McKinney to Austin, Texas several times for the holidays and family birthday celebrations. Tr. 240-41. She attended two retirement parties in January and February 2018. Tr. 242. She regularly went on 30-minute walks with her friend, Vikki Morgan, used a Bowflex for lower body exercise, and did relaxation yoga to help her sleep. Tr. 163-64, 243-44.

Petitioner stated she conducted Google searches to figure out what was wrong with her shoulder. Tr. 142-43. She was asked about a search she conducted on January 21, 2018 for "synovitis shoulder." Pet. Ex. 38 at 4. She stated that she was not familiar with the term "synovitis" but learned it through other searches she had done.[6] Tr. 144-49. She did a search on February 13, 2018, because it had been two months since the flu shot and her arm still hurt: "it continually got worse. That's why I was Googling and trying to find out why." Tr. 150; Pet. Ex. 37 at 4. She learned about SIRVA through her internet searches but denied knowing the SIRVA requirements or seeing anything about a 48-hour onset. Tr. 226-28; Pet. Ex. 31 at 5. She eventually searched "SIRVA", which led her to attorney websites with online forms for free consultation. She filled out a form on May 12, 2018, and spoke to her counsel on May 14, 2018. Tr. 167-68; Pet. Ex. 31 at 5-6; Pet. Ex. 35; Pet. Ex. 36; Pet. Ex. 37; Pet. Ex. 38. She confirmed that she spoke to an attorney two days before she saw a physician for left shoulder pain. Tr. 167-68, 171, 226; Pet. Ex. 3 at 9-10, 22-26.

---

[6] A lengthy exchange followed between the Court, petitioner, and counsel about the Google searches filed, since the searches did not contain the term "synovitis" until petitioner herself used it as a search term. After much posturing by petitioner's counsel, petitioner stated that she had also done research on her work computer during lunch and breaks, but that computer was no longer available, so she did not have access to those searches. Tr. 144-48. It was clear that petitioner did not produce all the searches she conducted pursuant to the Court's order, but rather she produced only those done on her personal computer. The Court spoke to counsel regarding the searches again after the hearing. Tr. 263-65.

Petitioner was questioned at length about her March 30, 2018 visit with Trey Tanella at Top Spa and about why none of the forms she filled out or the notes from the visit reflect reports of any shoulder or arm pain when she reported a host of other medical conditions and issues including left ankle swelling, skin cancer, a family history of breast cancer, rheumatoid arthritis, ocular rosacea, and dry eye. Tr. 151-54. Her answers were evasive. Tr. 161-63. She agreed that the Top Spa records included her past medical records and bloodwork. Tr. 215; Pet. Ex. 13 at 3-5.

Petitioner testified that between December 28, 2017 and May 16, 2018, when she first presented to Dr. Troop, the pain "was worse. It gradually – I can't just tell you exact days how bad, but it got worse." Tr. 164-65.[7] When pressed for an answer about when her pain worsened, she stated that "[i]t started getting worse as time went on . . . it was like that first day, it was more like what I normally would experience except it hurt more. I did think it would go away the next day and/or the next day"; "[i]t definitely got worse…"; "[i]t gradually got worse and worse"; and it worsened "significantly within the first month." Tr. 230-35. Her ability to rate the severity of her pain was also problematic, as were her explanations for what she reported about her extracurricular activities on various questionnaires and at medical visits. Tr. 149-62, 220, 237, 239-40, 249, 255-57.

Petitioner stated that she told Dr. Troop "everything" when she presented for the first time on May 16, 2018. Tr. 169. She confirmed that she reported 4.5 months of symptoms after a flu shot with soreness that never resolved, gradually worsened over time, and was now severe at a 10 out of 10. Tr. 170, 256; Pet. Ex. 3 at 9. She further confirmed that she filled out an intake form in anticipation of that first visit and included pain that radiated from shoulder to wrist with aching, burning, tingling, and weakness, but she did not recall when the radiating pain started. Tr. 170, 224-25, 230; Pet. Ex. 3 at 22-23. She later did not recall saying she had tingling and weakness at that visit, but [i]f I said it, I probably had a reason." Tr. 224-25. She did not recall if the pain was coming from her neck and shooting down her wrist. Tr. 228. She denied that the radiating pain was constant: "It is – it's not always. It's not every minute of every day, the radiating pain, but the shoulder – again, it's different, but you can still feel it hurting. But if you try to do something, obviously, you know, that's where that range of motion and all of that comes in and that strength." Tr. 258-59.

Petitioner stated that Dr. Troop never discussed what impingement syndrome was, but the Mobic and steroid injection he ordered helped temporarily. After the MRI of her shoulder, Dr. Troop told her that her "bursitis sac was inflamed and that wasn't uncommon . . . with a flu shot injury." Tr. 171-73. He prescribed physical therapy, and she went for therapy at the same time and location that she took her husband for his therapy. Tr. 174. She did not recall Dr. Troop using the term "cervical radiculopathy," but he referred her to Dr. Dauber, a neck specialist. Tr. 176.

---

[7] Petitioner's explanation for the five-month delay in seeking treatment is not being addressed in this ruling but remains an issue. Her answers to questions concerning this issue were evasive and she had to be reminded by the Court that the five-month delay in seeking treatment was an issue in this case particularly because she sought other health care during that time period. Further, once she presented to Dr. Troop on May 16, 2018 and in the two months thereafter, she saw several specialists for her neck and shoulder, had an MRI, x-rays, and a cortisone injection, and attended eight physical therapy treatments while being engaged in other activities. Tr. 233.

She saw Dr. Dauber on June 20, 2018. He sent her for x-rays but did not explain anything or the reason for her pain; "he just dismissed [her]." Tr. 177-79; Pet. Ex. 3 at 1-3. She later agreed she was sent to Dr. Dauber for cervical spine evaluation because of the pain and paresthesia radiating down her left upper extremity to the small and ring finger but added that it was not "like a 24-hour-a-day pain." Tr. 249-50.

Petitioner agreed she was discharged from physical therapy on July 9, 2018, and that she reported that her shoulder symptoms had resolved after dry needling. However, she stated that on that day, she had flare of radiating pain from her shoulder to her little finger after her grandchildren visited, and therefore disagreed that her shoulder symptoms had resolved. Tr. 179-81, 250-51. She agreed that the record reflected that "[r]emaining symptoms seem to be cervicogenic," and that she was then examined by a neurologist for the radiating pain and an MRI of the cervical spine showed spondylosis. She claimed that the doctor did not discuss that diagnosis with her. Tr. 250-52.

Petitioner stated that she saw Dr. Benae on July 24, 2018, at the recommendation of her physical therapist. Tr. 181-82; Pet. Ex. 6 at 7. She disagreed with the record from the visit, which documented that "[s]he reported months after flu vaccination she noted pain in neck and left upper extremity as well as numbness radiating to left small finger." She stated that her shoulder pain started immediately after the flu vaccine, the neck pain was not present all the time, and she could not remember when the numbness radiating to her left small finger started. Tr. 182-83. She stated the neck MRI "kind of clarified medically that that was not part of the flu shot, I guess." Tr. 183. She followed Dr. Benae's plan, which included PT and gabapentin. When asked if she went to PT after her last visit with Dr. Benae on July 30, 2018, she stated that they moved on July 31, 2018, she was concentrated on finding doctors for her husband in Austin, but her shoulder still hurt, and she went to PT "down the road." Tr. 183-84. When prompted by counsel, she stated she went back to PT after a motor vehicle accident.[8] Tr. 184.

Petitioner agreed that she returned to Dr. Troop in February 2019 because he was familiar with her history.[9] Tr. 187-88; Pet. Ex. 7 at 1-2. Her pain had worsened, and she received another cortisone injection, which only worked temporarily. She was prescribed Mobic and a Medrol Dosepak. Tr. 188-89.

She next reported shoulder pain at a routine primary care visit on July 29, 2019. She was interested in additional evaluation and treatment for her shoulder but she advised that she had to call her lawyer to find out if she could be seen by another doctor for her shoulder because she did not know the "rules." Tr. 189-90; Pet. Ex. 19 at 5-10.

Petitioner stated she was better in September 2019 until the car accident. Tr. 190-93. The accident occurred on a Friday, and she didn't seek medical care until the following Monday or

---

[8] Based on the record, the motor vehicle accident occurred in September 2019, 14 months after her visit with Dr. Benae.
[9] She therefore drove 220 miles each way to go back to Dr. Troop. *See* Tr. 240.

Tuesday. [10] She was experiencing pain in her ribs, shoulder, and neck. Tr. 192-94, 204-03; Pet. Ex. 19 at 11-14.

When she presented for physical therapy following the accident, she reported "a torn rotator cuff" on the intake form. Pet. Ex. 19 at 25. When asked about this, she stated, "I don't know why I wrote it, but I will say that I probably should have gone to the emergency room at that time." Tr. 194-95. She then stated her shoulder pain was from both the flu vaccine and the car accident, but she associated the pain after the accident with the flu vaccine. Tr. 196.

Petitioner's physical therapist suggested she see Dr. Ring, and she saw him on January 29, 2020. Tr. 197; Pet. Ex. 21 at 5-8. She didn't mention the car accident to Dr. Ring because he was part of UT Health, and she assumed he had all her records. Tr. 198. She stated that Dr. Ring believes in movement to help pain and encouraged her to play golf. He also recommended cognitive behavior therapy. She offered to send him all her records, but he said he would recommend cognitive behavior therapy regardless. Tr. 198. She agreed that she reported to Dr. Ring that she had "typical shoulder pain after receiving a flu vaccine in 2018. Never went away. After about three weeks, she did a Google search and found that this might be a compensable injury." Tr. 199; Pet. Ex. 21 at 7. She stated she did not know if she used the word "compensable", but she may have. She did not recall if her Google search was three weeks after the vaccination but had no reason to dispute that. [11] Tr. 199-200.

She agreed that the content of Dr. Troop's letter was correct, consistent with discussions they had during office visits, and that she has never spoken to him outside of an office visit. Tr. 201. She stated her pain lasted more than a year. Tr. 246.

## 2. Ben Mills

Ben Mills submitted two affidavits and testified at hearing. Pet. Ex. 16; Pet. Ex. 26. He recalled petitioner and her husband traveling to Austin, where he lives, in December 2017. Austin was about 220 or 230 miles from where his mother lived. Pet. Ex. 16 at 1-2; Tr. 68. He recalled that his mother received a flu vaccine right before coming to Austin and kept rubbing her arm and complaining about pain from the shot. Pet. Ex. 16 at 2; Tr. 70. He stated that she "really couldn't do much with that left side at that point." Tr. 85. She held her baby granddaughter in her right arm, and she told the older grandchildren not to jump or play roughly around her. Tr. 71, 85; Pet. Ex. 16 at 2. He remembered her complaining because he thought it was strange to have such pain from a flu vaccine. Pet. Ex. 16 at 2; Tr. 70-71.

Ben Mills recalled her complaining thereafter during their FaceTime conversations every two weeks or so, and that she complained that the pain got worse over time between January and May 2018. Pet. Ex. 16 at 2-3; Pet. Ex. 26 at 2; Tr. 68-69, 72, 87. He stated that it started as soreness, like the shoulder soreness that anyone would experience for a day or two after a flu shot. Tr. 87-88.

---

[10] The record indicates that the car accident occurred on September 20, 2019, and she presented for treatment on September 24, 2019. Pet. Ex. 19 at 11-14. September 24, 2019 was a Tuesday.

[11] The first Google search filed was for "synovitis" on January 21, 2018. Pet. Ex. 37 at 5.

He did not recall where on her arm it hurt, but he recalled her complaining of pain and "definitely" numbness and tingling, which concerned him because it was her left arm, and he thought about a heart attack. She talked about the tingling and numbness as far back as December or early January. Tr. 78-80. He pointed to the area between the top of his shoulder and bicep and between the neck and shoulder area. He stated the pain was down the arm some too, but he was not sure how far down. Tr. 85-86. He did not recall any complaints about her hand. Tr. 87.

Ben Mills knew petitioner went for treatment but did not recall when or any other details. Tr. 74, 80, 93. He recalled her talking about trouble sleeping. Tr. 74-75. He recalled her having pain for about a year but could not recall when it stopped being part of their conversations. Tr. 89.

He recalled his mother visiting several times before moving to Austin during the summer of 2018, and he visited for her retirement party in February 2018 and stayed with her. He was sure she would have brought up her shoulder but could not remember specifically. Tr. 90-93. He stated that petitioner and her husband lived on a golf course in McKinney and played routinely, but they both had health issues over the years, so golf declined. He did not know when they stopped playing golf. Tr. 93-94. He recalled petitioner was in a car accident in 2019 or 2020 and had back soreness. Tr. 96-97.

### 3. David Mills

David Mills submitted an affidavit and testified at the hearing. Pet. Ex. 27. David Mills stated that in 2017 and 2018, he was a graduate student and traveled 45 minutes from Austin to San Marcos for school daily with his three-year-old daughter who went to day care at his school. He FaceTimed with petitioner on the trip so she could keep his daughter entertained. He and his mother had their own conversations when his daughter was distracted with other activities. Pet. Ex. 27 at 1-2; Tr. 99-100, 102-04, 123-26.

He recalled that after winter break, petitioner regularly mentioned that her shoulder hurt from a flu vaccine. Her complaints were a "recurring theme" and "ongoing pattern" in their conversations. Pet. Ex. 27 at 2; Tr. 103-06, 111, 114. Petitioner continued to regularly mention her shoulder pain "through May 2018 and thereafter." Pet. Ex. 27 at 2.

He recalled a shopping trip in February 2018 in which he was concerned about leaving petitioner alone with the children in a shopping cart in case they wanted to get out of the cart because petitioner was unable to lift them due to her shoulder. Pet. Ex. 27 at 3; Tr. 106-08.

David Mills did not recall seeing petitioner between her flu vaccine and February 2018. He was unsure if he saw her over the holidays. Tr. 112. He only recalled shopping in February because of a Facebook post of photos taken during the event they shopped for. Tr. 118-19, 122; Pet. Ex. 27 at 2-3. He did not recall where on her arm the pain was, if it was shooting pain, or if she had numbness. He did not recall if petitioner held his daughter between January and March 2018, but it would make sense that she did not because she could not pick her up. Tr. 121-22.

David Mills stated that petitioner was "very prone toward natural and homeopathic medicine" and used natural and homeopathic resources for months before seeking treatment from

a physician for her shoulder pain. Pet. Ex. 27 at 3-4; Tr. 111, 114. He did not recall when she eventually saw a doctor. Tr. 112, 127. He did not know if her arm got worse, only that it was a recurring complaint. He did not recall when petitioner moved to Austin. Tr. 115.

According to Davis Mills, yoga was a "lifelong thing" for petitioner at various times, but he did not know specifically when she started or stopped yoga. He did not know if she played golf. Tr. 117, 122.

### 4. Carlton Williford

Mr. Williford is petitioner's husband. He submitted an affidavit but did not testify at the hearing. Pet. Ex. 30.

Mr. Williford recalled that petitioner told him she received the flu vaccine and was still in pain when she came home from her doctor's appointment on December 28, 2017. Pet. Ex. 30 at 1. Over the "next three weeks", petitioner complained of shoulder pain and needed help carrying materials at work. Pet. Ex. 30 at 2.

Mr. Williford affirmed that "[a]s each week went by, the pain increased." Pet. Ex. 30 at 2-3. Petitioner could not sleep, and he spent many nights sitting up with her and reassuring her she would get better. He recalled her saying that it had been going on a long time, but she kept thinking it would go away. *Id.* at 3. She continued to have pain in March and April but was not one to seek medical care unless it was an emergency. *Id.* at 2. She walked, did some yoga, and used the Bowflex for lower body strength. *Id.* He then provided details about his own health and stated that petitioner "sacrificed her own wellbeing" to care for him. *Id.* at 3-5.

Mr. Williford affirmed that when petitioner could not sleep one night she "googled" her symptoms and learned about SIRVA. Pet. Ex. 30 at 3. She then saw Dr. Troop, who was "instrumental in helping" petitioner and was familiar with patients injured from flu shots. *Id.*

Mr. Williford affirmed that petitioner stopped playing golf due to pain in her left arm. Pet. Ex. 30 at 5.

### 5. Vikki Morgan

Ms. Morgan is a co-worker and friend of petitioner. She submitted two affidavits and testified at the hearing. Pet. Ex. 15; Pet. Ex. 28. In 2017 and 2018, she and petitioner talked about five to six times a week as friends, played golf together twice a week, and walked about five days a week for between 30-45 minutes a day until petitioner moved in August 2018. Tr. 7-9, 32; Pet. Ex. 15 at 1-2; Pet. Ex. 28 at 2. She recalled that after petitioner's shoulder complaints started, she frequently declined invitations to play golf and did not play often but would ride along in the cart on Sundays: "She would putt and stuff like that, but full swings, no." Pet. Ex. 15 at 2; Tr. 11-12, 14. Ms. Morgan saw petitioner putt three or four times, but she "didn't play very much." She did not know when petitioner stopped playing golf altogether. Tr. 14, 27-28.

15

Case 1:19-vv-00579-UNJ Document 68 Filed 06/16/25 Page 16 of 22

According to Ms. Morgan, they both got flu shots so they could see their grandchildren. Tr. 9. She did not know when petitioner received the flu vaccine, only that it was December, probably during the school break. Tr. 14, 22-23. Ms. Morgan recalled petitioner saying her shoulder was really hurting "[l]ike within 24 hours" of getting the shot. Tr. 10. Petitioner then complained during their walks about her left shoulder and arm "being sore from a recent flu vaccination" between Christmas break through January 2018. Pet. Ex. 28 at 1-3; Tr. 10. Petitioner "consistently" complained of arm/shoulder pain associated with her flu vaccine and being unable to sleep on her left side. Pet. Ex. 28 at 2.

Ms. Morgan recalled petitioner's pain being in her mid-shoulder and arm up into her neck, but she was not sure it was actually into her neck. She did not recall if it moved down to her wrist, but "[t]hat would make sense." Tr. 17-18, 23. Ms. Morgan recalled asking petitioner to demonstrate the movements that caused her pain, and petitioner "could not make certain motions with her left arm/shoulder" because it caused pain. Pet. Ex. 15 at 2-3. She did not think petitioner could reach over her head. Tr. 18. Ms. Morgan worked in insurance in a doctor's office for several years and has family in the medical field, and what petitioner was describing sounded "like a nerve ending kind of pain, just because it shoots up the arm." Tr. 17, 30-31, 35.

Ms. Morgan recalled that petitioner complained of left arm/shoulder pain from her flu vaccine at a retirement party for petitioner at the golf club in February and did not play golf that day. Pet. Ex. 28 at 2; Tr. 12-13. She continued to complain in "March, April, May, June and July 2018," and she moved to Austin at the end of July 2018. Pet. Ex. 28 at 2.

Ms. Morgan recalled petitioner mentioning that she learned on the internet that the flu vaccine can cause the symptoms she was having and that the symptoms could take a long time to resolve. They discussed whether petitioner should see a doctor in McKinney or wait to see someone in Austin since she was moving soon. Pet. Ex. 28 at 3; Tr. 10-11. Ms. Morgan recalled telling petitioner, "[y]ou know, the pain's not that bad, I think you should wait till you get there." Tr. 28-30. Ms. Morgan added that petitioner had a lot going on between retiring and moving, and there were not enough hours in the day. Those things were her priorities, not getting treatment for her shoulder. Tr. 32, 38. Ms. Morgan believed petitioner was also visiting family in Austin about once a month during this timeframe, then more often when they started looking for houses. Tr. 33. Ms. Morgan did not recall Mr. Williford having any health problems until after they moved to Austin. Tr. 34.

Ms. Morgan stated petitioner was still complaining of shoulder pain six months later, and she told petitioner she was "just going to have to get to Austin, find somebody that knows how to treat this." Tr. 11. She stated that petitioner did not receive any treatment until after she moved to Austin, and she did not mention receiving PT. Tr. 19. She did not recall petitioner going to Top Spa. Tr. 28. Ms. Morgan stated that petitioner probably went for treatment after they got settled in Austin, but she did not know when. Tr. 21, 35-36. Ms. Morgan stated that if petitioner had seen a doctor before she moved to Austin, she would have mentioned it. Tr. 36.

When asked if petitioner got worse over time, Ms. Morgan stated that it "seemed to be the same nagging," but it was not altering her entire life. She assumed it got worse since petitioner went to see somebody and had treatment for it. Tr. 31.

16

### 6. Cindy Griffith

Ms. Griffith is a co-worker of petitioner. She submitted an affidavit and testified at hearing. Pet Ex. 29. Ms. Griffith and petitioner were part of team, and they saw each other one to three times a week. Pet. Ex. 29 at 1; Tr. 41-44.

Once petitioner retired, they spoke a few times and texted a few times, but it was months after petitioner moved to Austin before they called each other to catch up. They did not have social interactions outside of work before or after petitioner retired. Tr. 44-45.

Ms. Griffin recalled petitioner complaining of shoulder pain in January 2018, but she never followed up with petitioner about it. They discussed her shoulder again when petitioner called to ask her if she remembered anything about her shoulder and if she would be willing to speak with the lawyer. Tr. 58-64.

According to Ms. Griffith's calendar, she and petitioner had in-person meetings on January 3, 4, 9, and 19, 2018. Pet. Ex. 29 at 1. At one of those meetings, petitioner mentioned that "her shoulder was still sore" after receiving a flu vaccine. Pet. Ex. 29 at 2. At hearing, Ms. Griffith stated that petitioner told her that she was having "some problems pain-wise" from her flu vaccine and she was concerned that it was lingering in January 2018. Tr. 45-46, 55-56. Ms. Griffith believed petitioner was complaining about her upper arm and shoulder. She pointed to her shoulder and neck then down to almost her elbow as the location. Tr. 56-58. She recalled the conversation because petitioner was fairly private, and it was out of character for her to share personal things. Tr. 46-48.

Ms. Griffith recalled that petitioner told her she had seen someone for her shoulder, but she was unsure what kind of doctor petitioner saw but knew she had received care. Tr. 53, 58-59. In Ms. Griffith's understanding, when petitioner said her arm hurt, it meant pain. People usually refer to soreness after a vaccine, but that means pain and petitioner used both words during their conversation. Ms. Griffith stated that it was obviously enough of a distraction that petitioner mentioned it. Tr. 61.

## C. Other Evidence

### 1. Google Search History

Prior to the hearing, petitioner was ordered to file any and all records of Google searches in which she researched and learned of SIRVA. *See* ECF No. 43. She filed several exhibits consisting of screenshots of her Google search history. Pet. Ex. 35; Pet. Ex. 36; Pet. Ex. 37; Pet. Ex. 38. [12] Petitioner also submitted an affidavit from Sarah McCullar, a paralegal at petitioner's counsel's firm, affirming that she secured the searches discussed below by logging into petitioner's

---

[12] Petitioner was also ordered to file Google searches after the hearing because she testified that she conducted searches on other devices including her work computer and her cell phone. Tr. 142-48; ECF No. 55. Petitioner advised that she was unable to locate any additional relevant Google searches. ECF No. 62; Pet. Ex. 46.

Google account with her knowledge and consent. She filtered the search history to only show searches done between January 1, 2018 and May 31, 2018. Pet. Ex. 39.[13]

On January 18, 2018 at 6:35 pm, petitioner searched "food for flu and cold" and visited the webpage http://dailyburn.com/life/health/immune-system-foods-colds-flu/amp/". Pet. Ex. 37 at 5. On January 20, 2018 at 9:58 am, petitioner searched "flu symptoms 2018 diarrhea" and visited the webpage "http://fortune.com/2018/01/08/2018-flu-season-what-you-need-to-know/".    *Id.* Petitioner searched for "synovitis shoulder" on January 21, 2018 at 7:51 am and on February 4, 2018 at 5:10 am. Pet. Ex. 38 at 4. On January 26, 2018, Petitioner searched for "does flu start with sinuses draining 2018" at 8:52 pm. Pet. Ex. 37 at 4. On February 13, 2018, she searched for "why would flu shot have your arm aching 2 months later" at 9:03 am. *Id.*

On May 12, 2018, between 4:40 am and 12:45 pm, petitioner searched "rotator cuff injury" and visited the webpage "Improper Flu Shots Can Lead to Injury—But A Little-Known Gov't . . ."; searched "can a flu shot in upper arm tear a muscle"; visited the webpages "https://amp.peoplespharmacy.com/posts/why-does-my-shoulder-still-hurt-so-much-after-a-flu-shot" and "Can You Suffer an Injury Following the Flu Vaccine"; and searched for "Dallas injury attorney working with injured shoulder from flu shot" and "can Guillain-Barré syndrome be caused by flu shot 2018". Pet. Ex. 37 at 2-3. She also visited the webpages "https://amp.peoplespharmacy.com/posts/why-does-my-shoulder-still-hurt-so-much-after-a-flu-shot"; "Can You Suffer an Injury Following the Flu Vaccine"; "Shoulder Specialist Houston—K. Mathew Warnock MD"; and "Guillain Barre Syndrome | Vaccine Injury Lawyers". Pet. Ex. 38 at 2-3.

Also on May 12, 2018, petitioner conducted the following searches between 10:11 am and 1:22 pm: sirva amount of compensation"; sirva amount of compensation 2018"; "orthopedic surgeon familiar with SIRVA"; orthopedic surgeon with SIRVA experience in Dallas tx"; "orthopedic surgeon with SIRVA experience Dr. Klein"; "Dr. Klein orthopedic surgeon SIRVA"; and "Dr. Klein orthopedic surgeon specialty shoulder injuries related to SIRVA"; "Can You Suffer an Injury Following the Flu Vaccine?"; https://www.mctlawyers.com/vaccine-injury/cases; "National Vaccine Injury Compensation Program . . . – Federal Register"; and "Guillain Barre Syndrome | Vaccine Injury Lawyers".  Pet. Ex. 35 at 2-3; Pet. Ex. 36 at 2.

On May 13, 2018, between 6:59 pm and 7:11 pm, petitioner searched "FLUZONE QUAD 0.5ML > 3YRS given in left arm SIRVA"; "given in left arm SIRVA FLUZONE QUAD 0.5ML"; "orthopedic surgeon with sirva experience dr. klein"; "Dallas Texas orthopedic surgeon with sirva experience"; Sore Arm Persists for Weeks After Receiving Flu Shot"; "Sore Arm Persists For Weeks After Receiving Flu Shot 2017"; and "vaers table of reportable events following vaccination". Pet. Ex. 35 at 1; Pet. Ex. 37 at 1; Pet. Ex. 38 at 1. She also visited the webpages "htttps://www.peoplespharmacy.com/2015/01/26/sore-arm-persists-for-weeks-after-receiving-flu-shot/comment-page-7/", and "https://www.peoplespharmacy.com/2016/02/08/did-this-years-flu-shot-cause-persistent-arm-pain/". Pet. Ex. 37 at 1.

---

[13] Petitioner filed her Google searches in four different exhibits, and some of the same content appears in multiple exhibits. Further, while each exhibit shows the searches in chronological order, they have been reordered herein so the entirety of petitioner's searches may be reviewed in chronological order, regardless of which exhibit they are a part.

On May 16, 2018 at 4:54 pm, petitioner searched "how to read a mri of shoulder" twice, once on YouTube. Pet. Ex. 38 at 2.

### 2. Facebook Posts

Petitioner filed screenshots of several photos posted on Facebook, which include holding a child in her left arm and a baby in both arms in February 2018 (Pet. Ex. 40; Pet. Ex. 41); holding up a child using both arms on the beach in November 2018 (Pet. Ex. 42); sitting with children on the floor in December 2018 (Pet. Ex. 43); reaching out to an infant with her left arm on the floor in March 2022 (Pet. Ex. 44); and reaching out to her husband with her left arm on May 9, 2022 (Pet. Ex. 45).

### III.    Legal Standard for Fact Finding

Petitioner bears the burden of establishing her claims by a preponderance of the evidence. § 13(a)(1). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for making determinations in Vaccine Program cases regarding factual issues, such as the timing of onset of petitioner's alleged injury, begins with analyzing the medical records, which are required to be filed with the petition. § 11(c)(2). Medical records created contemporaneously with the events they describe are generally considered to be more trustworthy. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Human Servs.*, 993 F.3d 1378, 1382-83 (Fed. Cir. 2021) (clarifying that *Cucuras* does not stand for proposition that medical records are presumptively accurate and complete). While not presumed to be complete and accurate, medical records made while seeking treatment are generally afforded more weight than statements made by petitioner after-the-fact. *See Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) (finding that contemporaneously documented medical evidence was more persuasive than the letter prepared for litigation purposes), *mot. for rev. denied*, 127 Fed. Cl. 299 (2014). Indeed, "where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight." *Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006); *see United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948).

However, there are situations in which compelling oral testimony may be more persuasive than written records, such as in cases where records are deemed to be incomplete or inaccurate. *See Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."). The Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty

recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). Ultimately, a determination regarding a witness's credibility may affect the weight that such testimony should be given. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is used to overcome the weight generally given to contemporaneous medical records, such testimony must be "consistent, clear, cogent and compelling." *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998) (quoting *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *85 (Fed. Cl. Spec. Mstr. June 30, 1998)); *see, e.g.*, *Stevenson ex rel. Stevenson v. Sec'y of Health & Human Servs.*, No. 90-2127V, 1994 WL 808592, at *7 (Fed. Cl. Spec. Mstr. June 27, 1994) (crediting the testimony of a fact witness whose "memory was sound" and "recollections were consistent with the other factual evidence"). Moreover, despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. *Vallenzuela v. Sec'y of Health & Human Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng v. Sec'y of Health & Human Servs.*, No. 90-175V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb 18, 1994) (explaining that § 13(b)(2) "must be construed so as to give effect to § 13(b)(1) which directs the special master or court to consider the medical record...but does not require the special master or court to be bound by them"). In short, "the record as a whole" must be considered. § 13(a).

## IV.    Discussion and Findings of Fact

While the testimony, affidavits, and medical records pose many inconsistencies regarding other issues that exist in this case, the only issue addressed herein is onset. It is clear that petitioner's onset of pain and aching/soreness that never went away occurred immediately following her receipt of the flu vaccine on December 28, 2017.

My finding is based on the following facts: petitioner experienced pain "immediately" upon vaccination, but "[i]t wasn't anything other than it hurt . . ." Tr. 135-36, 206-07. She stated, "that first day, it was more like what I normally would experience except it hurt more." Tr. 230-31. The next day, her arm was aching and sore as if she had the flu. Tr. 135-36; Pet. Ex. 31 at 1. Her symptoms continued, never went away, and gradually worsened in the months that followed, until they progressed to severe pain with tingling, numbness, burning, and weakness from her neck down her arm to her wrist and fingers, prompting her visit to Dr. Troop on May 16, 2018. Tr. 87-88, 139, 233-34; Pet. Ex. 31 at 1; Pet. Ex. 3 at 9-12. When asked about her pain in the time between her visit with Mr. Tanella at Top Spa and her visit with Dr. Troop, she stated that it gradually worsened, but she could not recall when: "I can't just tell you exact days how bad, but it got worse." Tr. 164. When pressed for specificity regarding when it worsened, she responded "[i]t started getting worse as time went on." Tr. 230-31. She could not remember a particular point in time when it worsened, but "some time weeks or months later" she developed aching, burning, tingling, weakness, fatigue, and numbness, and pain in her neck. Tr. 230-34; Pet. Ex. 31 at 2. She then stated that the symptoms got "significantly" worse within the first month, and "[i]t was hurting

bad." It was not like her normal flu shot, and she had severe pain that she rated close to 10 out of 10 within two months. Tr. 233-34, 237, 239-40.

Petitioner's husband affirmed that petitioner complained of pain from her flu vaccine when she came home from the doctor that day, and her friend Vikki Morgan recalled petitioner complaining of pain "within 24 hours". Tr. 10; Pet. Ex. 30 at 1. Ben Mills recalled his mother rubbing her arm and complaining about pain from the flu shot she received just before coming to Austin in December 2017. Tr. 70, 135; Pet. Ex. 16 at 2. Ben Mills stated that his mother continued to complain of arm pain during their FaceTime conversations every two weeks or so, and she complained that the pain got worse as time went on between January and May 2018. Tr. 68-69, 72, 87; Pet. Ex. 16 at 2-3; Pet. Ex. 26 at 2. David Mills stated that after winter break and in January 2018, petitioner regularly mentioned that her shoulder hurt from a flu vaccine, and she continued to regularly mention her shoulder pain "through May 2018 and thereafter." Tr. 103-06; Pet. Ex. 27 at 2.

On January 21, 2018 at 7:51 am and on February 4, 2018 at 5:10 am, petitioner conducted Google searches for "synovitis shoulder". Pet. Ex. 38 at 4; Tr. 143-149. On February 13, 2018, petitioner searched "why would flu shot have your arm aching 2 months later". Pet. Ex. 37 at 4. At hearing, she stated that she conducted the search because it had been two months since the flu shot and her arm still hurt: "it continually got worse. That's why I was Googling and trying to find out why." Tr. 150.[14]

When petitioner presented to Dr. Troop for her left shoulder on May 16, 2018, Dr. Troop noted that "[t]he symptoms have been present for 4.5 months. She reports that the soreness in the shoulder began after she had a flu shot in her left deltoid. She reports that the soreness never resolved and has gradually worsened over time. Pain is severe with a rating of 10/10." Pet. Ex. 3 at 9. On June 20, 2018, when she presented to Dr. Dauber, she reported that the "symptoms have been present for (sic) since 12/28/17 . . . Since the onset, she reports the problem is getting worse . . . The patient had a flu shot which she indicates may have started the aggravation in her left upper extremity." Id. at 1.

At her visit with Dr. Benae on July 24, 2018, she reported "months after flu vaccination she noted pain in neck and [left upper extremity] as well as numbness radiating to L small finger." Pet. Ex. 6 at 7. When petitioner presented to Dr. Ring on January 29, 2020, she provided a history of flu vaccine in 2018[15] with typical shoulder pain that did not go away. After three weeks, she became concerned and "Googled it." Pet. Ex. 21 at 7. The first thing she found was that this might be a compensable injury, and having not had pain like this before, it resonated with her. Id.

Although there was a significant gap in time between petitioner's receipt of the flu vaccine on December 28, 2017 and her first presentation for medical treatment with Dr. Troop on May 16,

---

[14] While petitioner was ordered to file all Google searches related to SIRVA prior to the hearing and any other Google searches that she may have conducted on other devices after she stated at hearing that she also conducted searches on her work computer and cell phone, the searches she conducted on those devices were no longer accessible. Tr. 142-48; ECF No. 62; Pet. Ex. 46. During the hearing, petitioner testified that she may have learned the term "synovitis" in her searches on those other devices. Tr. 144-48.
[15] Petitioner's flu vaccine was on December 28, 2017. Petition at 1.

2018, she consistently related her pain and other shoulder symptoms to the December 28, 2017 flu vaccination when providing a history to her providers once she did seek treatment. Further, petitioner's claim that she experienced aching and soreness with pain immediately after receiving the vaccine is supported by her testimony and affidavits, as well as the testimony and affidavits of the witnesses in this matter. Accordingly, I find petitioner experienced pain and aching/soreness in her left arm that began immediately after vaccination and persisted and worsened in the following months.

## V.    Conclusion

After careful consideration and based on the record as a whole, petitioner had onset of pain and aching/soreness immediately upon receipt of the flu vaccine on December 28, 2017.

Accordingly, the parties shall file a joint status report within thirty (30) days advising how they will proceed. Based on that status report, a status conference will be scheduled if deemed necessary. The parties shall not hire any experts until directed to do so.

The following is hereby ORDERED:

The parties shall file a joint status report **by no later than <u>Monday, June 23, 2025</u>.**

**IT IS SO ORDERED.**

<u>**s/ Mindy Michaels Roth**</u>
Mindy Michaels Roth
Special Master

22